IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CYNTHIA ANDERSON,                    *
                                     *
Plaintiff,                           *
                                     *
v.                                   *        Case No. 4:03-CV-201 (CDL)
                                     *
CITY OF COLUMBUS, GEORGIA,           *
CARMEN J. CAVEZZA, and LIZ           *
TURNER,                              *
                                     *
Defendants.                          *

## O R D E R

Defendants have moved for summary judgment on all claims asserted by Plaintiff in her Complaint. Those claims are as follows: a violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.*; a claim under 42 U.S.C. § 1983; and state law claims for a violation of the Georgia wiretap statute, invasion of privacy, and intentional infliction of emotional distress. Plaintiff asserts these claims against the City of Columbus, Georgia and two of its employees. The claims against the employees are made in their official and individual capacities.

The City of Columbus responds that Title III does not apply to municipalities, and therefore, Plaintiff's Title III and § 1983 claims fail as a matter of law. The two employees maintain that one or more elements of a claim under Title III are absent as a matter of law, and therefore, seek summary judgment in their individual capacities as to Plaintiff's Title III and § 1983 claim. They also maintain that they

are entitled to qualified immunity.  As to Plaintiff's state law claims, the City of Columbus argues that it is entitled to sovereign immunity under Georgia law.  The City, along with the two employees, also contend that essential elements of the state law claims are absent as a matter of law, and therefore, they seek summary judgment on those claims.  For the reasons that follow, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.  BACKGROUND

Plaintiff began working for the City of Columbus as an administrative specialist, performing mainly secretarial tasks.  In 2001, Plaintiff was promoted to the position of Administrative Service Coordinator by Liz Turner.  Turner served as the assistant to the City Manager, Carmen Cavezza.

Plaintiff's new position was part of the City's creation of the Citizen Service Center, generally referred to as the "Call Center." The Call Center was designed to field phone calls from citizens seeking information or making complaints.  It handles the bulk of the City's phone calls, excluding those made to 911.  Turner became the City Manager for Citizen Services when the Call Center opened in 2001, but continued to report directly to Cavezza.  In her new position, Turner served as supervisor for the Call Center, and her office was located on the ground floor of the Columbus Government Center, where the Call Center was also located.  Plaintiff was expected to fill in for Turner as supervisor at the Call Center in the event that Turner

was absent.  Plaintiff also continued to work for Cavezza and two deputy City Managers.  Because of space restrictions, her office remained on the sixth floor of the Government Center.

Beginning in October 2001, the City installed a recording system so that all of the telephone calls into the Call Center were recorded. Plaintiff was aware of the selection and installation of the system and knew of the plans to record citizen telephone calls.  In the Call Center, there are nine separate telephones through which the calls are recorded.  The recording system allows the supervisor, Turner, to listen to recordings of calls from a particular telephone and to monitor a telephone conversation on one of the phones while it occurs. It was within Turner's discretion as to how often and how long she would listen to Call Center tapes.  She monitored the tapes at least once a week, attempting to listen to calls with each operator, particularly when the caller had a citizen complaint.

The operators in the Call Center use headsets when answering calls.  In order to use the headset, the telephone handset must be removed from the receiver.  After the recording system was installed, Call Center operators discovered that the system continued to record anything said into the headset while the telephone handset was off of the receiver, even after a call was disconnected, and would only stop recording if the handset was replaced.  Turner held a meeting with the Call Center operators to address the issue, which Plaintiff states she did not attend.  Turner and the operators learned that if an operator

3

pressed the "mute" button on the headset after a citizen call ended, the system could not record any private conversation that occurred while the operator was still wearing the headset.[1]

Turner asked Plaintiff to answer telephones in the Call Center beginning on December 26, 2001 because three regular operators were on vacation.  Prior to that time, Plaintiff had worked in the Call Center on one occasion in May 2001.  Plaintiff, in addition to three other operators, answered calls in the Call Center on December 26 and 27, and for part of the day on December 28.  Turner also worked on December 26 and 27, but left early both days.

On December 27, a conversation between Plaintiff and the other three operators was recorded, apparently without the knowledge of Plaintiff and the operators,[2] during which Plaintiff made disparaging remarks about Turner and the City Manager's office.  Turner listened to the recorded conversation while reviewing Call Center tapes.  She reported the comments to Cavezza, and he met with Plaintiff on January 2, 2002 to discuss the recorded conversation.  Plaintiff verbally agreed to resign by February 1, 2002, but withdrew her resignation and took unauthorized leave.  Her employment was then terminated effective January 28, 2002.

---

[1]Turner explained in her deposition that while the system would continue to record, the mute button prevents the speaker from being heard, so there would be no sound for the system to record.

[2]The other operators—Erica Woods, Larry Condiff, and Melinda Smith—do not recall being informed that they could avoid having personal conversations recorded through the headset by using the telephone's mute button.

4

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this "initial responsibility" by showing that there is an absence of evidence to support the nonmoving party's case or by

showing that the nonmoving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991).  To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.  "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences . . . in his favor." *Four Parcels*, 941 F.2d at 1437 (internal quotations and citations omitted).

## III. DISCUSSION

### A.   Title III Claim

Plaintiff asserts a private right of action under § 2520 of the federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq*.  Section 2520 provides that: "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." *Id*.

To recover under § 2520, Plaintiff must show that Defendants violated § 2511, which generally prohibits the intentional interception (or attempted interception), disclosure, or use of any

wire, oral, or electronic communication.  18 U.S.C. § 2511.  The word "intercept," as used in the statute, means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

For Plaintiff's claim to survive summary judgment, she must establish that Title III is applicable to Defendants and that a question of material fact exists as to whether:  (1) her communications were intercepted by Defendants through the use of any electronic, mechanical, or other device; (2) Plaintiff "had an expectation that [her] oral communications were not subject to interception"; and (3) if Plaintiff had such an expectation, "the expectation was justified under the circumstances." *Walker v. Darby*, 911 F.2d 1573, 1578 (11th Cir. 1990).

Defendants contend that Plaintiff's claim fails on multiple grounds.  The Court will address the merits of each argument in turn.

### 1.  Municipal Liability

Defendant City of Columbus contends that Title III does not apply to municipalities.  The Eleventh Circuit has not squarely addressed this issue.  District courts within this circuit, however, have held that municipalities are subject to liability as entities under Title III.  *See Conner v. Tate*, 130 F. Supp. 2d 1370 (N.D. Ga. 2001); *Tapley v. Collins*, 41 F. Supp. 2d 1366, 1380 (S.D. Ga. 1999).  There is a split among the other circuit courts of appeal on this issue.  The

Seventh Circuit has held that municipalities cannot be held liable under Title III, *Abbott v. Vill. of Winthrop Harbor*, 205 F.3d 976 (7th Cir. 2000), while other circuits have reached the opposite conclusion. *See Adams v. City of Battle Creek*, 250 F.3d 980 (6th Cir. 2001).

The circuit split arises from different interpretations of a 1986 amendment to § 2520(a) of Title III. Prior to the amendment, § 2520(a) provided that a recovery in a civil action may be had from "the person" who engaged in the violation. "Person" was defined as (and is still defined as) "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6). It is generally agreed that the definition of "person" therefore excludes governmental entities. *Conner*, 130 F. Supp. 2d at 1374; *see also* S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2179 ("The definition explicitly includes any officer or employee of the United States or any State or political subdivision of a State. Only the governmental units themselves are excluded."). Consequently, before the 1986 amendment, it was clear that Title III did not apply to municipalities.

In 1986, § 2520(a) was amended to add the word "entity" so that the amended section provided that recovery in a civil action may be had "from the person *or entity* which engaged in that violation." Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, § 103, 100 Stat. 1848 (1986) (emphasis added). The Sixth Circuit

8

has determined that the addition of entity to § 2520(a) must mean something other than a business entity, since business entities are already included in the definition of person. Accordingly, the court concluded that entity, as it is used in § 2520(a), must refer to governmental entities; otherwise, the inclusion in § 2520(a) would be "superfluous." *See Adams*, 250 F.3d at 985; *see also Conner*, 130 F. Supp. 2d at 1374. The Sixth Circuit observed that the legislative history on the amendment to § 2520(a) is silent on the reason for the addition of entity. As explained by that court, the term "entity" was also added to the civil liability provision in Title III for interception of stored wire and electronic communications via the 1986 amendments. 18 U.S.C. § 2707(a). The Senate Report summarizing the amendment to § 2707(a) explicitly states that a party "aggrieved by any violation of this new chapter may recover from any person or entity—including governmental entities—who knowingly or intentionally violated this chapter." S. Rep. No. 99-541, at 43 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3597. The Sixth Circuit has therefore held that Congress intended for governmental entities to also be held liable under § 2520(a).

The Seventh Circuit has reached a contrary conclusion. In *Abbott*, the court held that the statutory definition of person clearly excluded governmental entities. It concluded that the later inclusion of entity in § 2520(a) did not demonstrate Congressional intent to extend liability to governmental entities. 205 F.3d at 980-81.

9

Statutory interpretation begins with determining whether the language of the statute "'has a plain and unambiguous meaning with regard to the particular dispute.'" *United States v. Fisher*, 289 F.3d 1329, 1337-38 (11th Cir. 2002).  In the event that the statutory language is "'not entirely transparent,'" the court must turn to other rules of statutory construction before consulting the legislative history of the statute.  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1167 (11th Cir. 2003).  "[C]ourts may reach results inconsistent with the plain meaning of a statute 'if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd.'"  *CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001).  When the statutory language still remains ambiguous, the court may then "examine extrinsic materials, including legislative history, to determine Congressional intent."  *Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000).

Considering these guidelines for statutory interpretation and the conflicting opinions of other circuits, the Court finds the interpretation of the Seventh Circuit to be the better reasoned approach.  Title III authorizes a civil action against a person or entity that violates its provisions.  Person is specifically defined in the statute to include certain entities while excluding others.  Municipalities are not included in the definition of person, and are therefore excluded.  The issue to be decided is whether the amendment

10

that added entity was intended to substantially broaden the scope of liability under the statute to an entire new class of potential defendants (municipalities) or whether entity was simply intended to refer to those entities that are included as potential defendants under the definition of person.  The Court finds that entity refers to the entities mentioned in the definition of person and that the addition of this one word, without more, was not intended to open the litigation flood gates to an entirely new class of defendants.

Even if the Court found the language to be ambiguous, the legislative history does not support the conclusion that Congress intended by adding entity to expand liability to municipalities.  In the face of congressional silence on the issue, this Court cannot conclude that the inclusion of a single word evinces congressional intent "'to subject an entire class of defendants to potential liability without any expression of that intent in the legislative commentary.'"  *Abbott*, 205 F.3d at 980 (quoting *Amati v. City of Woodstock*, 829 F. Supp. 998, 1003 (N.D. Ill. 1993)).  Accordingly, the Court concludes that municipalities are not subject to suit under Title III, and Defendants' Motion for Summary Judgment as to Plaintiff's Title III claim against the City of Columbus is granted.

The Court next must determine whether the elements of a Title III claim are present as to the individual Defendants, Cavezza and Turner. Defendants contend that no violation of Title III occurred because the Defendants did not intend to record Plaintiff's conversations, the

11

recording was subject to the business extension exemption, and Plaintiff consented to the recording and/or had no expectation of privacy regarding the recording.  Defendants also maintain that even if they violated Title III, they are entitled to qualified immunity.

### 2.  Intent

Defendants maintain that no evidence exists that they intended to record Plaintiff's conversation.  Therefore, Plaintiff's Title III claim must fail.  The 1986 amendments to Title III changed the requisite mental state for a violation from "wilfully" to "intentionally."  This change was intended "to underscore that inadvertent interceptions are not crimes under the Electronic Communications Privacy Act."  S. Rep. No. 99-541, at 24 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3578.[3]  The Senate Report on the amendments also notes that "intentionally" means that the conduct "[was] done or accomplished 'on purpose,'" regardless of motive.  Id.

The Eleventh Circuit has not specifically addressed the requisite intent necessary for a violation of Title III under the circumstances of this case.  Defendants rely upon case law from the Fourth Circuit, which generally cites the 1986 amendments to the statute and holds that § 2511 "proscribes only 'intentional[ ]' interceptions."  Sanders v. Robert Bosch Corp., 38 F.3d 736, 742 (4th Cir. 1994).  While Sanders appears to be a correct statement of the intended effect of

---

[3]The required state of mind for a violation of Title III is not dependent on whether the alleged conduct is being prosecuted as a crime or in a civil action.

the amendments, Defendants particularly rely on the case based on its factual similarity to the case at hand. In *Sanders*, due to a design defect, the handset microphones located in a guardroom picked up ambient noise and transmitted it to the security control room. *Id.* at 737-38. The court held the interception of conversations through the defective handsets was inadvertent and *not* intentional because "the fact that the microphone was on was the result of a design defect and was not known to anyone." *Id.* at 742-43.

*Sanders* is distinguishable from the present case insofar as Defendant Turner is concerned. In this case, evidence exists that Turner was aware of the glitch in the recording system when the headsets were used. Therefore, a reasonable jury could conclude that Turner knew that the system would record Plaintiff, and she intentionally failed to tell Plaintiff how to prevent the recording. Whether Turner intentionally intercepted Plaintiff's conversations raises a genuine issue of fact.[4] Therefore, summary judgment is not appropriate in favor of Turner based upon a lack of intent. Since the Court has granted summary judgment to Defendant Cavezza based upon the absence of any evidence of intent, the Court will examine the

---

[4]Defendants also assert that because Plaintiff admitted in her deposition that Defendant Carmen Cavezza did not intentionally record her communications with her co-workers, Cavezza cannot be held liable under Title III. (Pl.'s Dep. at 48.) Plaintiff fails to respond to this argument in her response to Defendants' motion; she merely continues to assert that "Defendants" are liable under Title III. Because Plaintiff has not come forward with any evidence that would create a genuine issue of material fact as to Cavezza's intent to record Plaintiff's communications, the Court grants summary judgment as to Plaintiff's Title III claims brought against Cavezza.

remaining defenses to the Title III claim only as they relate to Defendant Turner.

### 3.   Business Extension Exemption

Defendant Turner contends that the recording of Plaintiff's conversations are exempted from coverage under Title III, and therefore, no violation occurred.   Title III applies to the "interception" of certain communications.   Title III defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."   18 U.S.C. § 2510(4). Accordingly, "[t]here is no interception and thus no liability under Title III if the aural acquisition is through the use of an instrument which falls outside the definition of 'electronic, mechanical, or other device.'" *Epps v. St. Mary's Hosp. of Athens, Inc.*, 802 F.2d 412, 415 (11th Cir. 1986).   Those terms are further defined in the statute as any kind of device which can be used to intercept a wire, oral, or electronic communication, excluding:

> [A]ny telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business . . . .

18 U.S.C. § 2510(5)(a)(i).   This exclusion is referred to as "'the extension phone exception' or the 'business extension exemption.'"

14

*Epps*, 802 F.2d at 415 (citing *Briggs v. American Air Filter Co., Inc.*, 630 F.2d 414, 425 (5th Cir 1980) and *Watkins v. L. M. Berry & Co.*, 704 F.2d 577, 580 (11th Cir. 1983)).

Relying upon *Epps*, Turner argues that the business extension exemption applies to the recording of Plaintiff's conversations. A closer examination of the facts in *Epps* reveals that it is distinguishable from the case at bar. The telephone system at issue in *Epps* was located in the Emergency Medical Services (EMS) offices at St. Mary's Hospital. *Id.* at 413. One office housed the dispatch console, into which emergency calls were made and from which dispatchers notified emergency medical technicians. *Id.* Calls coming into or originating from the dispatch console were automatically recorded; outgoing calls not originating in dispatch could be recorded manually. *Id.* One EMS employee, Stone, used a "ringdown line" to call another employee, Epps, in the westside substation; this "ringdown line" connected the dispatch office to the westside substation of the EMS offices. *Id.* A third employee, Smith, overheard some disparaging remarks made about supervisors during this telephone conversation. *Id.* at 414. After listening for approximately fifteen minutes, she went to the dispatch center to relieve the dispatcher on duty and began to manually record the conversation she had overheard. *Id.* at 413-14.

The Eleventh Circuit determined first that the intercepting device used was the dispatch console, rejecting the plaintiffs'

contention that the electronic or mechanical device used for interception was the recording equipment. *Id.* at 415. The court then concluded that the dispatch console was clearly telephone equipment or a telephone facility as contemplated by the language of the business extension exemption.[5] *Id.*

The plaintiffs in *Epps* finally argued that the exemption did not apply "because the interception and recording of their conversation was not in the ordinary course of . . . business," since the only calls automatically recorded were those coming into or going out from the dispatch console. *Id.* at 416. Plaintiffs also pointed out that the hospital did not have a policy of monitoring other types of calls; hospital personnel were not authorized to record other calls; and Smith, who recorded the call from the dispatch console, was not an authorized dispatcher according to EMS policy. *Id.* The court rejected these arguments, holding that because the call "occurred during office hours, between co-employees, over a specialized extension which connected the principal office to a substation, and concerned scurrilous remarks about supervisory employees in their capacities as supervisors," it was in the hospital's ordinary course of business to take an interest in the call. *Id.* at 417 ("Certainly the potential contamination of a working environment is a matter in which the employer has a legal interest."). The court held that the

---

[5]In so concluding, the Eleventh Circuit dismissed the plaintiffs' contention that a standard telephone extension must be used for the exemption to apply. *Id.* at 415.

business extension exemption was applicable; therefore, there was no liability under Title III. *Id.*

Relying upon *Epps,* Defendants contend that the telephone system at the Call Center clearly falls within the statutory definition of "any telephone or telegraph instrument, equipment or facility, or any component thereof." Plaintiff essentially does not dispute this point. Defendants then maintain that the interception of Plaintiff's conversation took place during the ordinary course of business because, as in *Epps*, the conversation was recorded while Plaintiff was at work and it was a work-related conversation with her co-workers that contained derogatory comments about her supervisors.

Plaintiff responds by noting that Defendants actually recorded every conversation Plaintiff had while wearing her headset that day, not just the conversation containing remarks about her employer. Defendants take the position that even though other, nonwork-related communications were intercepted, much of the recordings concern City business and all of the recordings took place while Plaintiff was at work in the Call Center, during business hours, and occurred between Plaintiff and other employees.

It is unknown how much of Plaintiff's recorded communications (outside of actual citizen calls) contained purely personal matters, but Defendants do admit that some of the intercepted communications were completely unrelated to the City's business. Taking the intercepted communications *as a whole*, not merely Plaintiff's

objectionable statements about her supervisors, and following *Epps*'s focus on the contents of the communications, it cannot be determined as a matter of law that the communications were intercepted in the ordinary course of business because Defendants cannot demonstrate that it was in the ordinary course of their business to monitor everything Plaintiff said while wearing her headset.  As the Eleventh Circuit has observed, "these exemptions do not automatically justify interception of an entire call.  The expectation of privacy is not lost entirely because the privacy of part of it is violated." *Watkins*, 704 F.2d at 584.  The court emphasized that "[t]he violation . . . is the intercepting itself, not the interception of particular material." *Id.*

Case law preceding *Epps* is instructive in interpreting the scope of the phrase "in the ordinary course of business" as it is applied in the Eleventh Circuit.  Beginning with *Briggs v. American Air Filter Co., Inc.*, the former Fifth Circuit held that where a supervisor listened in on a business call between an employee and his friend, an employee of a competitor, based on his suspicion that the employee was revealing confidential information to the competitor, his actions were done in the ordinary course of business.[6]  630 F.2d at 420.  In reaching this conclusion, the court noted that the interception of the call was limited in time and purpose (long enough to determine that

---

[6]The plaintiffs in *Briggs* submitted an affidavit in which they admitted that the call at issue was a business, not a personal, call.  *Id.*

18

the supervisor's suspicions were correct) and not part of a general

practice of surreptitious monitoring.  In sum, the court stated:

> We decide only that when an employee's supervisor has
> particular suspicions about confidential information being
> disclosed a business competitor, has warned the employee
> not to disclose such information, has reason to believe
> that the employee is continuing to disclose the
> information, and knows that a particular phone call is with
> an agent of the competitor, it is within the ordinary
> course of business to listen in on an extension phone for
> at least so long as the call involves the type of
> information he fears is being disclosed.

*Id.*

Following *Briggs*, the Eleventh Circuit had the occasion to

consider some of the issues left open by *Briggs* in *Watkins v. L. M.*

*Berry & Co.,* 704 F.2d 577 (11th Cir. 1983).  In *Watkins*, the plaintiff

was a sales representative who was informed at the beginning of her

employment that sales calls would be monitored by a supervisor via an

extension telephone.  *Id.* at 579.  Employees were permitted to make

personal telephone calls on their company phones and were told that

personal calls would not be monitored except to the extent needed to

determine whether the call was business or personal.  *Id.*  The

plaintiff received a personal call during which her friend asked the

plaintiff about a recent job interview.  *Id.*  Plaintiff's supervisor

was monitoring the call and heard the discussion of the interview.

*Id.*

To rely on the business extension exemption, the *Watkins* court

noted that the defendants had to "show that the interception of the

call beyond the initial period was in the ordinary course of

business." *Id.* at 581. Defendants argued that it was within the ordinary course of business for them to monitor the call because the plaintiff's interview with another employer was of interest and concern to them. *Id.* The Eleventh Circuit stated that "[t]he phrase 'in the ordinary course of business' cannot be expanded to mean anything that interests a company," and went on to hold that "a personal call may not be intercepted in the ordinary course of business under the exemption . . . except to the extent necessary to guard against unauthorized use of the telephone or to determine whether a call is personal or not." *Id.* at 582, 583. The court characterized this as permitting interception of a call "to determine its nature but never its contents." *Id.* at 583.[7]

None of these cases stands for the proposition that Defendants suggest: that an employer, in the ordinary course of business, may surreptitiously intercept everything an employee says while at his desk. That is essentially what happened to Plaintiff here; all of her communications while wearing her headset (presumably while at her workstation in the Call Center) were intercepted without her knowledge. The trilogy of *Briggs*, *Watkins*, and *Epps* does not logically extend that far.

---

[7]The court further held that a precise determination of how long the supervisor was justified in listening to the call was an issue for the trier of fact to decide, and reversed and remanded for further proceedings. *Id.* at 584.

Succinctly stated, Eleventh Circuit case law on the business extension exemption does not support Defendants' contention that their interception of Plaintiff's communications over a period of almost three days was in their ordinary course of business.  Accordingly, summary judgment is not appropriate on that basis.

### 4.   Consent/Expectation of Privacy

Relying on 18 U.S.C. § 2511(2)(c), Turner next asserts that Plaintiff's claim under Title III fails because she gave her implicit consent to the interception.  That subsection establishes that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."  *Id.*

As noted above, it is disputed as to whether Plaintiff ever knew of the glitch in the recording system.  Defendants acknowledge that they cannot show definitively that Plaintiff was informed of the problem.  Instead, they argue that Plaintiff impliedly consented to interception of her calls "because she knew or should have known from the surrounding circumstances that [her] conversations would be recorded."

The Eleventh Circuit has strongly cautioned that "[c]onsent under title III is not to be cavalierly implied."  *Watkins*, 704 F.2d at 581.  The court noted that Title III contains strict limitations on when

21

lawful interception may occur and found that the purpose of the statute would be "thwart[ed] . . . if consent could be routinely implied from circumstances." *Id.* For that reason, "knowledge of the *capability* of monitoring alone cannot be considered implied consent." *Id.* In *Watkins*, plaintiff consented to complete monitoring of her business calls and limited inadvertent interception of her personal calls. *Id.* The Eleventh Circuit held that consent could be limited in this way and left it to the trier of fact to determine the scope of the plaintiff's consent and whether and to what extent the interception exceeded that consent. *Id.* at 583-84.

In this case, the most that can be determined is that Plaintiff consented to the interception of all *telephone calls* that were made through her telephone in the Call Center.  If an employee's implied consent cannot be determined as a matter of law in *Watkins*, where the employee knew that some portion of her personal calls might be inadvertently intercepted, it is certainly not appropriate to rule as a matter of law in this case, where the additional monitoring occurred through the headset when the telephone was not actually in use.[8]

A related issue is whether Plaintiff had an expectation that her conversations were free from interception. *See* 18 U.S.C. § 2510(2) (defining oral communication as "any oral communication uttered by a

---

[8]It would be particularly incongruous to find implied consent when based on the deposition testimony in this case, employees were surprised and upset to discover that their other conversations had been recorded, and when Turner, the supervisor of the Call Center, was completely unaware of the glitch until it was accidentally discovered.

22

person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation"). The Eleventh Circuit has made clear that this is a two-step inquiry: (1) whether the plaintiff "had a subjective expectation that his conversations were free from interception"; and (2) "whether that expectation was objectively reasonable." *Walker*, 911 F.2d at 1578.

Defendants do not dispute that Plaintiff at a minimum had a subjective belief that her conversations were free from interception. Instead, they contend that this expectation was not objectively reasonable. When the evidence is viewed in the light most favorable to the Plaintiff, the fact is that she did not know that the headset she was wearing essentially operated as a microphone if she did not use the mute button. It is not enough for Plaintiff to know that her telephone conversations were recorded to impute knowledge that all conversations could be recorded. Under the circumstances, Plaintiff has brought forward enough evidence to show that she had an objectively reasonable expectation that the only recording that took place occurred during a telephone call because that was how the system was intended to work and that was how she was informed the system did in fact work. Consequently, the Court finds that summary judgment is inappropriate on both grounds: Plaintiff's implied consent and Plaintiff's unjustified expectation of privacy.

### 5. Qualified Immunity

Having found that genuine issues of material fact exist as to whether Turner's conduct violates Title III, the Court next must determine whether Turner nevertheless is entitled to qualified immunity. The defense of qualified immunity is available to public officials who are sued in their individual capacities under Title III. *Tapley v. Collins*, 211 F.3d 1210, 1216 (11th Cir. 2000). Defendant Turner is immune from suit unless she violated "'*clearly established statutory or constitutional rights* of which a reasonable person would have known.'" *Hutton v. Strickland*, 919 F.2d 1531, 1535-36 (11th Cir. 1990).[9] Under qualified immunity analysis, the public official must first demonstrate that she was acting within the scope of her discretionary authority when the allegedly unlawful conduct took place. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003). Once the official has established that, the burden shifts to the plaintiff to demonstrate that qualified immunity does not apply, which requires a two-part inquiry: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a [statutory] right?" and (2) If a statutory right would have been violated under the Plaintiff's version of the facts, was the right clearly established? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

[9]The qualified immunity defense, if applicable, would also be available to Cavezza, had the Court not already determined that he is not liable under Title III due to Plaintiff's failure to produce evidence on the issue of intent.

24

The parties do not dispute that Turner was acting in her discretionary authority. Plaintiff's argument in support of her contention that Turner violated a clearly established statutory right is scant; she essentially makes the conclusory statement that "Defendants have blatantly defied a clearly delineated federal statute."[10] However, the facts, as viewed in Plaintiff's favor would support a violation of Title III: Plaintiff's communications were intercepted and recorded without her knowledge by means of her headset, which Turner knew was capable of intercepting and recording Plaintiff's communications.

While Defendants contend that it was not clearly established that Turner could not intercept Plaintiff's communications in this manner, their analysis is centered on their interpretation of the facts, which assumes that this was an inadvertent interception. As noted above, the facts are in dispute over whether the interception was intentional or inadvertent. Under Plaintiff's version of the facts, which the Court must accept as true, the statute itself sets forth clearly that

---

[10]Before reaching this conclusion, Plaintiff quotes at length from *Conner v. Tate*, which compares the qualified immunity analysis when the plaintiff has alleged a constitutional violation to when the plaintiff has alleged a statutory violation, noting that in the case of statutory violation, the officer at least has a "clear text" to know that his actions are unlawful, rather than case law interpretations that constitutional violations require. 130 F. Supp. 2d at 1379. Defendants seize on this portion of Plaintiff's brief to argue that Plaintiff is claiming that because Defendants violated a statute, qualified immunity is unavailable. It does not appear that this was Plaintiff's intended argument, as it would be an untenable position, but her failure to present cohesive argument on the issue of qualified immunity allowed Defendants to jump to that conclusion.

Turner's alleged conduct would be a violation.  Therefore, Turner is not entitled to qualified immunity as a matter of law.

Based on the foregoing, Defendant Turner's Motion for Summary Judgment as to Plaintiff's Title III claim is denied.

**B.   § 1983 Claim**

In addition to her claim brought directly pursuant to Title III, Plaintiff also asserts a claim under § 1983 for violations of Title III.  Plaintiff also maintains, for the first time in her brief, that she is entitled to pursue a § 1983 claim based upon Defendants' violation of her Fourth Amendment right to be free from unreasonable searches and seizures.

**1.   Statutory Violation**

Defendants contend that the City, Turner, and Cavezza (in their official capacities) are not liable under § 1983 because Plaintiff has not shown that a municipal policy or custom existed that caused the violation.[11]  They also argue that Turner and Cavezza (in their individual capacities) enjoy qualified immunity.

A more fundamental approach to Plaintiff's § 1983 claim reveals that Plaintiff's claim must fail.  Plaintiff has not set forth a cognizable claim under § 1983 because she is already able to vindicate her statutory rights under Title III by bringing a civil action for damages as authorized in that statute.  If a plaintiff wishes to

---

[11]The Court agrees with Defendants that Plaintiff, had she asserted a cognizable § 1983 claim, has still failed to establish that her alleged injury was caused by a policy, custom, or practice of the City.

enforce an existing statutory federal right under § 1983, "courts must look to whether Congress intended to 'foreclose[ ] a remedy under § 1983' either 'expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Schwier v. Cox*, 340 F.3d 1284, 1292 (11th Cir. 2003).   A civil enforcement mechanism for a Title III violation is already in place, and it allows for damages, just as a § 1983 action would. There is no reason for Plaintiff to look to § 1983 as "an 'alternative source of *express* congressional authorization of private suits.'" *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 509 n.9 (1990).   In effect, Plaintiff would be recovering for the exact same claim/violation under two different statutes.   Because Plaintiff has failed to state a cognizable cause of action under § 1983 for violation of Title III, Defendants' Motion for Summary Judgment is granted to the extent it is sought on this claim.

### 2.   Constitutional Violation

Plaintiff makes no allegations of a § 1983 claim for violation of her Fourth Amendment rights in her Complaint.   She alleges in her Complaint that:

> Acting under color of law, Defendants worked a denial of Plaintiff's rights, privileges or immunities secured by the United States Constitution or by Federal law, to wit, Defendants intentionally used an electronic or mechanical device to intercept Plaintiff's oral communication in violation of 18 U.S.C. § 2510 *et seq*.

27

Compl. at ¶ 20.  This count is labeled in Plaintiff's Complaint as: COUNT I:  VIOLATION OF 42 U.S.C. § 1983; VIOLATION OF FEDERAL WIRETAP ACT.  Defendants and Plaintiff essentially treat this claim as a § 1983 claim for a violation of a federal statute, not a violation of a constitutional right.[12]  Plaintiff's response to Defendants' Motion for Summary Judgment briefly includes a statement, without further explanation, that the Complaint "causes unnecessary confusion" because it should not have included the phrase "in violation of 18 U.S.C. § 2510 *et seq.*"  However, Plaintiff goes on to argue in her response, addressing Defendants' claim of qualified immunity, that "Defendants in the case currently at bar *have not violated some vague Constitutional right defined by case law*; the Defendants have blatantly defied a clearly delineated federal statute."  None of Plaintiff's argument regarding qualified immunity ever mentions the Fourth Amendment, how Defendants' conduct constituted an unreasonable search or seizure, or how the law was clearly established that Plaintiff had a constitutional right to be free from an unreasonable search or seizure under the circumstances alleged.[13]  The first, and

---

[12]Defendants note in their discussion of Plaintiff's § 1983 claim that "Plaintiff has failed to even demonstrate that her constitutional rights have been violated."

[13]The Eleventh Circuit has also acknowledged that although Title III and Fourth Amendment claims are similar, there is a difference between the reasonable expectation of privacy an employee has in his "personal conversations taking place in the workplace and . . . [the] reasonable expectation that those conversations will not be intercepted by a device which allows them to be overheard inside an office in another area of the building." *Walker*, 911 F.2d at 1579.  For a Fourth Amendment claim of this type, an employee must show that he had "a reasonable expectation of

28

only mention, of the Fourth Amendment by Plaintiff does not occur at all until Plaintiff's surreply brief, where she states only that "Plaintiff has put forth sufficient evidence to show that there is a jury question regarding whether Defendants violated the Federal Wiretap Act and whether they violated Plaintiff's Constitutional right to be free of unreasonable searches and seizures pursuant to the Fourth Amendment."

Based on the Court's examination of Plaintiff's Complaint and her argument opposing Defendants' Motion for Summary Judgment, the Court concludes that Plaintiff has never properly raised a claim of a Fourth Amendment violation. Her Complaint clearly identifies her § 1983 claim as one for violation of the federal wiretap statute. Plaintiff had the opportunity to amend her Complaint and did not do so. She is not permitted to amend it "through argument in a brief opposing summary judgment," as she has attempted to do in her response and surreply to Defendants' motion. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Therefore, the Court finds that

---

privacy" in his workplace. *Id.* at 1578; *see also O'Connor v. Ortega*, 480 U.S. 709, 717 (explaining that in determining whether employee had reasonable expectation of privacy in his workplace requires balancing of societal expectations of privacy in workplace with "operational realities of the workplace"). Stated more simply, there is a difference between an expectation of privacy and an expectation of noninterception, and the Eleventh Circuit has recognized—with apparent approval—that other courts have found an action for a Title III violation exists "even in the absence of an expectation of privacy as generally understood in the Fourth Amendment search and seizure context." *Walker*, 911 F.2d at 1578. Plaintiff has also failed to address the differences in a claim of a Title III violation and a Fourth Amendment violation.

Plaintiff has not properly asserted a § 1983 claim for the alleged violation of her Fourth Amendment rights.

**C.   State Law Claims**

  **1.   Georgia Wiretap Statute**

  The Georgia statute prohibiting "unlawful eavesdropping or surveillance" is similar to Title III.  O.C.G.A. § 16-11-62.  Under the statute, it is unlawful for "[a]ny person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place."  O.C.G.A. § 16-11-62(1).  Defendants contend that this claim should be disposed of on the same grounds as set forth in their argument on the Title III claim, i.e., the recording was not intentional and plaintiff had no expectation of privacy.  As to Defendant Turner, the Court finds that the same genuine issues of material fact exist with regard to this state law claim as the Court found regarding Plaintiff's Title III claim.  Therefore, Defendant Turner is not entitled to summary judgment on this claim.  Furthermore, for the same reasons that Defendant Cavezza was entitled to summary judgment on Plaintiff's Title III claim based upon a lack of any evidence of intent, Defendant Cavezza is likewise entitled to summary judgment on this state law claim.  As to the liability of the City on this claim, the Court finds that it is entitled to sovereign immunity, and therefore, summary judgment in its favor is appropriate on this claim.  *See Swan v. Johnson*, 219 Ga. App.

450, 452, 465 S.E.2d 684, 686-87 (1995) (holding that unified governments are equivalent to counties under Georgia law regarding tort liability and noting that General Assembly did not waive immunity of counties under Georgia Tort Claims Act).

### 2.   Invasion of Privacy

Plaintiff also makes a state law claim for invasion of privacy. Georgia has recognized the right of privacy since 1905. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68 (1905).  The tort of the invasion of privacy has subsequently been divided into four separate rights of privacy against: "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation for the defendant's advantage, of the plaintiff's name or likeness." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370, 151 S.E.2d 496, 500 (1966).  Defendants and Plaintiff appear to agree that Plaintiff's claim would be one for intrusion.  The parties agree that such intrusion must be intentional.  Defendants argue that there was no intrusion because Plaintiff made the statements that were recorded in a conversation with three other co-workers, and she therefore had no expectation of privacy in the statements that she made.

As to the claim against Cavezza, the Court finds that since there is no evidence of his intent, he is entitled to summary judgment on

31

this claim, also.  As to Turner, the Court finds that genuine issues of material fact exist as to her liability for invasion of privacy. Finally, the Court finds that the City is entitled to sovereign immunity on this claim.  *See Swan*, 219 Ga. App. at 452, 465 S.E.2d at 686-87.

### 3.   Intentional Infliction of Emotional Distress

According to Plaintiff, her claim of intentional infliction of emotional distress is based on Defendants' deliberate and willful violation of her civil rights in recording her conversation.

To recover for intentional infliction of emotional distress, "the defendant's actions must have been so terrifying or insulting as naturally to humiliate, embarrass, or frighten the plaintiff." *Moses v. Prudential Ins. Co. of Am.*, 369 S.E.2d 541, 542 (Ga. Ct. App. 1988).  A plaintiff therefore must show:

> (1) that the defendant's behavior was willful and wanton and intentionally directed to harming plaintiff; (2) that the actions of the defendant were such as would naturally humiliate, embarrass, frighten, or outrage the plaintiff; and (3) that the conduct caused mental suffering or wounded feelings or emotional upset or distress to the plaintiff.

*Coleman v. Housing Auth. of Americus*, 381 S.E.2d 303, 306 (Ga. Ct. App. 1989).  Liability for intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Jenkins v. Gen. Hosps. of Humana, Inc.*, 395 S.E.2d 396, 398 (Ga. Ct. App. 1990). Liability has only been found when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

32

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Phinazee v. Interstate Nationalease, Inc.*, 514 S.E.2d 843, 845 (Ga. Ct. App. 1999) (internal quotation marks omitted). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Northside Hosp., Inc. v. Ruotanen*, 246 Ga. App. 433, 435, 541 S.E.2d 66, 69 (2000).

Even viewing Defendants' conduct in the light most favorable to Plaintiff, the intentional monitoring of Plaintiff's conversation, leading to her termination, is not sufficiently outrageous conduct to support a claim of intentional infliction of emotional distress. Plaintiff fails to identify a factually similar case in Georgia case law to support her claim, and Georgia law is replete with instances of comparable or far more shocking conduct that failed to meet the standard on summary judgment. *See Everett v. Goodloe*, 602 S.E.2d 284, 292 (Ga. Ct. App. 2004) (no claim for intentional infliction of emotional distress where employer "exposed his sexual organ to [plaintiff], forced her to touch him, lunged at her, grabbed her breasts, and sexually harassed her"); *Lively v. McDaniel*, 522 S.E.2d 711, 713 (Ga. Ct. App. 1999) (no claim of intentional infliction of emotional distress where employer stated plaintiff had retained or stolen valuable documents after his termination); *Biven Software, Inc. v. Newman*, 473 S.E.2d 527, 529-30 (Ga. Ct. App. 1996) (no claim for

33

intentional infliction of emotional distress where supervisor spoke to plaintiff in rude and condescending manner, belittled her, criticized her work, imposed unreasonable deadlines, and required plaintiff to work long hours and leave a number where she could be reached at any time); *Peoples v. Guthrie*, 404 S.E.2d 442, 444 (Ga. Ct. App. 1991) (no claim of intentional infliction of emotional distress for "false accusation of dishonesty or lack of integrity in connection with one's employment conduct"); *Moses*, 369 S.E.2d at 542 (no claim for intentional infliction of emotional distress where supervisor left threatening message on plaintiff's answering machine, stating that he would break plaintiff's neck or sue him). The facts of this case fail, as a matter of law, to reach the standard of egregiousness required by Georgia law.

The Court also notes that Plaintiff has adduced very little evidence that she experienced severe emotional distress "'*that no reasonable man could endure*.'" *Peoples*, 404 S.E.2d at 444 (citing *Bridges v. Winn-Dixie Atlanta, Inc.*, 335 S.E.2d 445,448 (Ga. Ct. App. 1985)). Plaintiff states in her deposition that she "felt really upset about what happened" after her termination and sought treatment from a psychiatrist at the Pastoral Institute for six sessions. (Pl.'s Dep. at 63-64.) Plaintiff testified, in response to questioning, that her psychiatrist, Dr. Jan Anderson, never stated whether Plaintiff's problems were related to work. There is no further description or evidence of her mental state; Plaintiff has not

34

provided any medical or treatment records from Dr. Anderson. For these reasons, the Court grants summary judgment as to all Defendants on Plaintiff's claim of intentional infliction of emotional distress.

## IV.  CONCLUSION

In summary, the Court grants in part and denies in part Defendants' Motion for Summary Judgment as follows:

1. The Court DENIES summary judgment as to Liz Turner on Plaintiff's claim under Title III. The Court GRANTS summary judgment as to the City of Columbus and Carmen Cavezza on Plaintiff's claim under Title III;

2. The Court GRANTS summary judgment as to all Defendants on Plaintiff's § 1983 claim;

3. The Court DENIES summary judgment as to Liz Turner on Plaintiff's claim under the Georgia Wiretap Act. The Court GRANTS summary judgment as to the City of Columbus and Carmen Cavezza on that claim.

4. The Court DENIES summary judgment as to Liz Turner on Plaintiff's claim of invasion of privacy. The Court grants summary judgment as to the City of Columbus and Carmen Cavezza on that claim; and

5. The Court GRANTS summary judgment as to all Defendants on Plaintiff's claim of intentional infliction of emotional distress.

IT IS SO ORDERED, this 23rd day of June, 2005.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE